FILED
United States Court of Appeals
Tenth Circuit

October 9, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KRISTIN JACOBS, legal guardian of E.J.;
AMANDA SANDY, legal guardian of
H.S.; DISABILITY LAW CENTER,

    Plaintiffs - Appellants,

v.

SALT LAKE CITY SCHOOL DISTRICT;
BOARD OF EDUCATION OF SALT
LAKE CITY SCHOOLS,

    Defendants - Appellees.

------------------------------

COUNCIL OF PARENT ATTORNEYS
AND ADVOCATES, INC.; NATIONAL
DISABILITY RIGHTS NETWORK; THE
ARC OF THE UNITED STATES,

    Amici Curiae.

No. 23-4058

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:21-CV-00706-JNP)**
_____

Laura Henrie (Michelle Marquis, Katie Cox, and Maya V. Anderson, with her on the briefs) of Disability Law Center, Salt Lake City, Utah, for Plaintiffs-Appellants.

Joan M. Andrews (Matthew S. Brahana, with her on the brief) of Fabian Vancott, Salt Lake City, Utah, for Defendants-Appellees.

Selene Almazan-Altobelli, Council of Parent Attorneys and Advocates, Towson, Maryland, and Ellen M. Saideman, Law Office of Ellen Saideman, Barrington, Rhode Island, filed an amicus brief on behalf of Council of Parent Attorneys and Advocates, Inc., National Disability Rights Network, and Arc of the United States, in support of Plaintiffs-Appellants.

—————————————————————

Before **MORITZ**, **EBEL**, and **ROSSMAN**, Circuit Judges.

—————————————————————

**EBEL**, Circuit Judge.

—————————————————————

Plaintiffs—two elementary school students with intellectual disabilities and their advocate—challenge the manner in which Defendant Salt Lake City School District ("District") educates its intellectually disabled students. Plaintiffs allege that the District automatically places students with intellectual disabilities in self-contained special education classes in a few designated schools located throughout the district, without first making an individualized assessment whether, as for each student, a more appropriate educational placement would instead be in a general education classroom, supported by supplementary special education services. Plaintiffs contend that the District's failure to make an individualized placement determination for each intellectually disabled student violates the Individuals with Disabilities in Education Act ("IDEA"), as well as the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"). The district court dismissed all Plaintiffs' causes of action at the outset of this case, primarily under Fed. R. Civ. P. 12(b)(6), after construing Plaintiffs' claims to be seeking only

placement in their neighborhood schools, relief which the Tenth Circuit has already determined is unavailable under these statutes.

We disagree with the district court's interpretation of Plaintiffs' claims as limited to seeking only to attend their neighborhood schools. We conclude, instead, that Plaintiffs have sufficiently stated plausible claims for relief under all three statutes by alleging that the District fails to make individualized educational placement determinations for each intellectually disabled student. Therefore, having jurisdiction under 28 U.S.C. § 1291, we REVERSE the district court's decision to dismiss Plaintiffs' claims and REMAND this case to the district court for further proceedings.

## I. BACKGROUND

In setting forth the relevant background, we rely primarily on the factual allegations Plaintiffs included in their amended complaint, which at this early stage of the litigation we accept as true. See Thomas v. Nat'l Ass'n of Letter Carriers, 225 F.3d 1149, 1157 (10th Cir. 2000) (reviewing dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)).[1]

---

[1] We also refer, where appropriate, to the District's power point presentations, which Plaintiffs attached to their amended complaint; and several documents from the individual student Plaintiffs' IDEA administrative proceedings, which the amended complaint references and the District attached to its motion to dismiss. See E.W. v. Health Net Life Ins. Co., 86 F.4th 1265, 1286 n.3 (10th Cir. 2023). Because neither side provided the district court with the full administrative records from the individual Plaintiffs' IDEA administrative proceedings, see 20 U.S.C. § 1415(i)(2)(C)(i) (noting district court "shall receive the records of the administrative proceedings"), we have not considered those records.

## A. The District's "hub" system

The District adopted what it refers to as its "hub" system in March 2019. This system "consolidate[d] educational services for certain children with intellectual disabilities and/or cognitive impairments" in a few designated elementary schools in the District.[2] (Joint Appendix ("J.A.") 70 ¶ 152.) Students that the District "categorize[s]" as having "mild/moderate" intellectual disabilities are assigned to one of three of the District's twenty-seven elementary schools, while students "categorized" as having "severe" intellectual disabilities are assigned to one of four other elementary schools. (J.A. 70 ¶ 155.) The District places intellectually disabled students in one of these two categories based solely on their IQs. "[S]tudents with an IQ above 70 or without a flat IQ profile" are placed in the mild/moderate category, while "student[s] with an IQ of less than 70 with a flat IQ profile" are placed in the severe category (J.A. 75 ¶ 185; see also J.A. 60 ¶ 91).

The District does not "consider the individual needs of students in assigning them to [these] group programs." (J.A. 71 ¶ 158.) Nor does the District "meaningful[ly]" consider whether intellectually disabled students could be placed in the "general education environment" (J.A. 78 ¶ 199), rather than the "predetermined" special education class (J.A. 78 ¶¶ 202–03). "The stated purpose of the ['hub' system's] consolidation was to congregate children with disabilities at specific

---

[2] Although this litigation focuses on how the District educates intellectually disabled elementary school students, the "hub" system also applies to intellectually disabled middle and high school students.

elementary schools in an effort to maximize efficiency in service delivery and transportation." (J.A. 70 ¶ 152.)

**B. This litigation**

**1. Plaintiffs**

Three Plaintiffs brought this action: two individual District students, through their legal guardians, and their advocate, the Disability Law Center.

**a. Individual Plaintiffs**

The two individual Plaintiffs, E.J. and H.S., are intellectually disabled District students eligible to receive special education and related services.

**i. E.J.**

Since 2014—before the District adopted its "hub" system—the District had placed E.J. in a "'mild/moderate' . . . special . . . self-contained classroom at [a] designated school with a small group of same-age peers." (J.A. 59 ¶ 89.) Beginning fall 2019, under the "hub" system, the District assigned E.J. and her classmates to Emerson Elementary, one of the three "hub" schools with a special education class for students with "mild/moderate" intellectual disabilities.

E.J.'s parents challenged her placement at Emerson and invoked the IDEA's administrative procedures, see 20 U.S.C. § 1415, to obtain a "Due Process Hearing with the Utah State Board of Education." (J.A. 48 ¶ 32.) In those administrative proceedings, E.J.'s parents "alleged violations of the IDEA and the ADA [but not Section 504 of the RA] on behalf of [E.J.] as well as similarly situated students." (J.A. 48 ¶ 32.) The hearing officer dismissed for lack of jurisdiction E.J.'s ADA

5

claim and the IDEA claim to the extent it was asserted on behalf of other students. After conducting a four-day evidentiary hearing on E.J.'s individual IDEA claim, the hearing officer ruled against E.J., finding that, as to E.J., the District had made an appropriate individualized educational placement determination.

### ii.  H.S.

Plaintiff H.S.'s parents enrolled him in the District in fall 2019.  "Even before H.S.'s IEP [individual education plan] was fully developed" (J.A. 51 ¶ 57), the District assigned H.S. to "a self-contained special class for students with 'severe' disabilities" at a designated "hub" school "on the sole basis that this was the only option available to students categorized as 'severe' under the hub plan" (J.A. 51 ¶ 56).  When H.S.'s parents objected to that placement, the District "terminated the limited [special education] services H.S. had been receiving."  (J.A. 51 ¶ 57.)  Since then, H.S. has attended his neighborhood elementary school "with no special education services."  (J.A. 51 ¶ 58.)

H.S.'s parents sought an administrative "Due Process Hearing with the Utah State Board of Education," asserting "violations of the IDEA and the ADA [but not the RA] on behalf of [H.S.] as well as similarly situated students."  (J.A. 49 ¶ 41.)  As in E.J.'s case, the hearing officer dismissed H.S.'s ADA claim, as well as his IDEA claim to the extent it was asserted on behalf of other students.  The hearing officer then denied H.S. an administrative hearing on his individual IDEA claim because his "parents had not properly consented to special education services."  (J.A. 49 ¶ 44.)  See 34 C.F.R. § 300.300(b)(3).

6

**b. The Disability Law Center**

Plaintiff Disability Law Center ("DLC") is a non-profit corporation that "is a federally authorized and funded organization under the Protection and Advocacy for Individuals with Developmental Disabilities Act ('PADD')," 42 U.S.C. §§ 15041–15045. (J.A. 52 ¶ 60.) Utah's governor has designated the DLC "as the state's protection and advocacy ('P&A') system" under PADD. (JA 52 ¶ 60.) As such, Congress has authorized the DLC "to 'pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [individuals with developmental disabilities] within the State who are or who may be eligible for treatment, services, or habilitation.'" (J.A. 52 ¶ 61 (quoting 42 U.S.C. § 15043(a)(2)(A)(i))).

**2. District court proceedings**

After their administrative proceedings concluded, E.J. and H.S., joined by the DLC, initiated this litigation in the district court against the District and its School Board (collectively "District"). Plaintiffs asserted claims under the IDEA, the ADA and, for the first time, the RA.

As relief, Plaintiffs sought declaratory and injunctive relief on behalf of themselves and "other similarly situated students." (J.A. 85 § VIII(A)-(D).) The District did not challenge Plaintiffs' ability to assert such representative claims and this court has previously recognized the possibility of such claims, see N.M. Ass'n for Retarded Citizens v. New Mexico, 678 F.2d 847, 849–51 (10th Cir. 1982) (class action alleged state's "entire special education service system" violated Section 504

7

of the RA and sought declaratory and injunctive relief on behalf of elementary and secondary school-age handicapped children); see also Ass'n of Cmty. Living in Colo. v. Romer, 992 F.2d 1040, 1042, 1044 (10th Cir. 1993) (dismissing IDEA class action for failure to exhaust administrative remedies, but noting in dicta that administrative exhaustion might be excused as inadequate or futile "where plaintiffs allege structural or systemic failure and seek systemwide reform").

The District moved to dismiss all Plaintiffs' claims under either Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction or Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Relevant here, the District argued under Rule 12(b)(1) that Plaintiffs failed to exhaust their administrative remedies as to their RA claim.[3]  The district court agreed with the District and dismissed Plaintiffs' RA claim without prejudice.  Plaintiffs appeal that ruling.[4]

---

[3] The District made this failure-to-exhaust argument under Rule 12(b)(1) because this court has previously treated exhaustion required by the IDEA as jurisdictional.  See Muskrat v. Deer Creek Pub. Schs., 715 F.3d 775, 779–80, 783 (10th Cir. 2013). More recently we have questioned the propriety of that approach, in light of the Supreme Court's admonitions against using the "jurisdictional" label too freely.  See id. at 783–84.  For purposes of this appeal, however, we need not decide whether IDEA exhaustion is properly characterized as a jurisdictional prerequisite.  See id. at 784–85; see also, e.g., Carroll v. Lawton Indep. Sch. Dist. No. 8, 805 F.3d 1222, 1230 n.4 (10th Cir. 2015).  Our standard of review for Rule 12(b)(1) decisions made, as here, on the pleadings, is generally the same standard that we apply when reviewing Rule 12(b)(6) decisions: We review the dismissal decision de novo and accept the complaint's well-pled factual allegations as true.  See Smith v. United States, 561 F.3d 1090, 1097–98 (10th Cir. 2009).

[4] We have appellate jurisdiction under 28 U.S.C. § 1291 to consider this appeal from the district court's final decision dismissing this case, even though the district court dismissed Plaintiffs' RA claim without prejudice.  On this point, we are persuaded by the reasoning in Abu-Nantambu-El v. Oliva, 282 F. App'x 658, 661–62 (10th Cir.

The District also moved, under Rule 12(b)(6), to dismiss Plaintiffs' IDEA and ADA claims with prejudice for failure to state a claim upon which relief can be granted. The District's Rule 12(b)(6) motion sought dismissal on a narrow ground. The District interpreted Plaintiffs' claims to be seeking only to receive special education services in their neighborhood school and argued the Tenth Circuit had already held that relief to be unavailable in Murray ex rel. Murray v. Montrose County School District RE-1J, 51 F.3d 921 (10th Cir. 1995), and Urban ex rel. Urban v. Jefferson County School District R-1, 89 F.3d 720 (10th Cir. 1996) (applying Murray). The district court agreed with the District's interpretation of Plaintiffs' claims and, relying on Murray and Urban, dismissed Plaintiffs' IDEA and ADA claims for failing to state a claim on which relief can be granted. Plaintiffs also challenge that ruling on appeal.

## II. ARTICLE III STANDING

As a threshold matter, we consider Plaintiffs' Article III standing. In the district court, the District argued each Plaintiff lacked standing. The district court rejected that argument and held, instead, that each Plaintiff has standing. The District neither challenges that ruling nor reasserts its standing arguments on appeal. Nevertheless, we must satisfy ourselves that at least one plaintiff has Article III standing in order to insure that there is a case or controversy properly before us. See

_____

2008) (unpublished) (holding dismissal without prejudice for failure to exhaust administrative remedies is a final decision appealable under 28 U.S.C. § 1291; collecting cases treating similar rulings as final and appealable).

9

Animal Legal Def. Fund v. Kelly, 9 F.4th 1219, 1226 n.5 (10th Cir. 2021).  We are satisfied that, at a minimum, the individual Plaintiffs have Article III standing.

To establish standing, Plaintiffs must show that 1) they have suffered an actual injury, 2) fairly traceable to the challenged action, the District's "hub" system, 3) that can be redressed by a favorable ruling.  See Murthy v. Missouri, 603 U.S. 43, 57 (2024).  Both individual Plaintiffs have sufficiently alleged that they have suffered an actual injury fairly traceable to the "hub" system.  Plaintiff E.J. has alleged that, as a result of the "hub" system, her education has been detrimentally affected because she has been assigned to a special education classroom with students who exhibit maladaptive behavior and bullying; she has been denied the opportunity to associate at school with her non-disabled neighborhood peers; and she has to spend more time on the bus going to and from school each day.  H.S. has alleged that, after he chose to attend his neighborhood school instead of the designated "hub" school to which he had been assigned, the District declined to provide him with the special education services that he is otherwise qualified to receive.  Plaintiffs have further alleged that these injuries are likely to be redressed if the individual Plaintiffs succeed in obtaining the relief they seek in this case, an injunction requiring the District to make individualized determinations as to the most appropriate educational placement for them.  Satisfied that, at a minimum, the individual Plaintiffs have Article III standing, we turn to the merits of this appeal.

### III. DISCUSSION

The district court dismissed this case on a narrow ground. The court dismissed Plaintiffs' IDEA and ADA causes of action under Fed. R. Civ. P. 12(b)(6), after construing Plaintiffs' claims to be seeking only placement in their neighborhood schools, relief which the Tenth Circuit has already determined is unavailable under those statutes. Reviewing that dismissal de novo, see Thomas, 225 F.3d at 1157, we disagree with the district court's restrictive interpretation of Plaintiffs' claims as limited to seeking only to receive special education services in their neighborhood schools. We conclude, instead, that Plaintiffs also alleged that the District categorically assigns intellectually disabled students to special education classrooms without making individualized determinations for each student as to whether that is the most appropriate educational placement. Those allegations are sufficient to state plausible claims for relief under the IDEA and the ADA. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (holding that, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). We also conclude that the district court erred in dismissing Plaintiffs' claim under the RA's Section 504 as unexhausted. Plaintiffs' allegations are sufficient to state a plausible claim under Section 504 as well.

To explain why, we begin with Plaintiffs' IDEA claim, before turning to their discrimination claims.

11

## A. IDEA claim

### 1.  Plaintiffs assert a claim under the IDEA on behalf of themselves and similarly situated students

Plaintiffs assert, on behalf of themselves and similarly situated students, that the District's "hub" system violates the IDEA.  The District does not challenge Plaintiffs' assertion of such a representative claim.

#### a. We interpret Plaintiffs' amended complaint to allege that the District fails to make individualized educational placement determinations

In support of their IDEA claim, we interpret Plaintiffs' amended complaint to allege that the District, in implementing its "hub" system, fails to make individualized educational placement determinations as to whether the most appropriate placement for each intellectually disabled student is in a special or a general education classroom.

For example, in the amended complaint's general allegations, Plaintiffs assert that, pursuant to the "hub" system, the District "assigned [individual] Plaintiffs [E.J. and H.S.] to a category based on the severity of their disabilities and their need for accommodation in the classroom"; and "further assigned those students to certain 'hub' schools based on that categorical designation," without considering "Plaintiffs['] individual needs."  (J.A. 45–46 ¶¶ 17–19; see also J.A. 69 ¶¶ 144–45; 78–79 ¶¶ 201–11.)  Specifically, Plaintiffs allege that the District categorizes intellectually disabled students solely by their IQ: "[S]tudents with an IQ above 70 or without a flat IQ profile" are placed in the mild/moderate category, while "student[s]

12

with an IQ of less than 70 with a flat IQ profile" are placed in the severe category (J.A. 75 ¶ 185; see also J.A. 60 ¶ 91).  Students that the District "categorize[s]" as having "mild/moderate" intellectual disabilities are then assigned to one of just three of the District's twenty-seven elementary schools, while students "categorized" as having "severe" intellectual disabilities are assigned to one of four other elementary schools.  (J.A. 70 ¶ 155.)

Plaintiffs go on to reiterate several times in their amended complaint that the District does not make placement decisions on an "individualized" basis, including alleging:  "The only decision relevant to school placement is whether or not the child has a 'mild/moderate' or 'severe' intellectual disability or cognitive impairment" (J.A. 74 ¶ 177); and that "[i]t is [the District's] chosen methods of administration and the configuration of its service delivery system that require students to be congregated and separated from their neighborhood schools, rather than any unique or individualized need of a particular child" (J.A. 74 ¶ 176; see also J.A. 67 ¶ 133; 77 ¶ 197).

Plaintiffs also allege facts to support their claim that the District fails to make an individualized assessment of each intellectually disabled student's educational placement.  For example, Plaintiffs allege:  The District determined that E.J. would attend a "hub" school without any discussion of her "specific needs."  (J.A. 60 ¶ 93; see also J.A. 50 ¶¶ 51–52; 59 ¶ 90; 61 ¶ 96.)  Further, Plaintiffs allege that the District assigned H.S. to a "hub" school for "severe" intellectually disabled students before the District even developed an individualized education plan for him (J.A. 51

13

¶ 57), and, in assigning him to a "hub" school, "offered no individualized justification for its decision" (J.A. 64 ¶ 117; see also J.A. 51 ¶¶ 56, 59).

In specifically stating their IDEA claim, Plaintiffs assert, among other things, that the District is violating the IDEA by

> [f]ailing to make Plaintiffs' placement decisions based on their individual needs and instead basing the decision on the availability of group programs and other impermissible factors such as the category of disability, severity of disability, availability of special education and related services, configuration of the service delivery system, availability of space, and/or administrative convenience.

(J.A. 84 ¶ 234(b).)  Plaintiffs go on to allege that the District is doing this by, among other things,

> [f]ailing to give full consideration to the full range of supplementary aids and services that could be provided to Plaintiffs in the regular education environment before removing them to one of the District's designated "hub schools" for students with intellectual disabilities and/or impairments.

(J.A. 84 ¶ 234(b)(i).)  Finally, among the remedies that Plaintiffs seek in their amended complaint is an order directing the District

> to make individualized placement decisions for each of the Plaintiffs based on their IEPs and meaningfully consider the full continuum of placement options and supplementary aids and services necessary to place them at their neighborhood schools.

(J.A. 86 § VIII(E).)

Plaintiffs have, thus, alleged that the District, in implementing its "hub" system, fails to make individualized determinations as to whether each intellectually disabled student should be assigned to a special or a general education classroom.

14

**b. Plaintiffs' allegations that the District fails to make individualized educational placement determinations for each intellectually disabled student state a plausible claim under the IDEA**

Plaintiffs' allegations that the District, in implementing its "hub" system, fails to make individualized determinations as to whether each intellectually disabled student should be assigned to a special or a general education classroom state a plausible claim on which relief can be granted under the IDEA.  See K.D. ex rel. C.L. v. Dep't of Educ., 665 F.3d 1110, 1123 (9th Cir. 2011) ("A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement.").

Briefly explained, the IDEA generally requires individualized educational decisions for each disabled student.  Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education ['FAPE'] that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A) (emphasis added).

> At the "core" of the FAPE requirement is the "cooperative process . . . between parents and schools," Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005), to jointly craft an "'individualized education program,' or IEP" for each disabled student, Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. 386, 391 (2017) (quoting 20 U.S.C. § 1401(9)(D)).

> An IEP is the "comprehensive plan" by which "special education and related services are 'tailored to the unique needs' of a particular child." Endrew F., 580 U.S. at 391 (quoting [Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v.] Rowley, 458 U.S. [176,] 181 [(1982)]).

15

Alex W. ex rel. Marlene W. and William W. v. Poudre Sch. Dist. R-1, 94 F.4th 1176,

1180 (10th Cir. 2024).

Relevant here, the IDEA further obligates states "to educate disabled children

in the 'least restrictive environment' in which they can receive an appropriate

education." Murray, 51 F.3d at 926. To that end, the IDEA requires that,

> [t]o the maximum extent appropriate, children with disabilities . . . are
> educated with children who are not disabled, and special classes, separate
> schooling, or other removal of children with disabilities from the regular
> educational environment occurs only when the nature or severity of the
> disability of a child is such that education in regular classes with the use of
> supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); see also 34 C.F.R. § 300.114(a)(2).

"In conjunction with this right" to receive a FAPE in the least restrictive

environment, "'[e]ach public agency must ensure that a continuum of alternative

placements is available to meet the needs of children with disabilities for special

education and related services.'" Ellenberg v. N.M. Mil. Inst., 478 F.3d 1262, 1268 (10th

Cir. 2007) (quoting 34 C.F.R. § 300.115(a)).

Recognized alternative educational placements include "instruction in regular

classes, special classes, special schools, home instruction, and instruction in hospitals

and institutions"; the continuum of alternative educational placements must "[m]ake

provision for supplementary services (such as resource room or itinerant instruction)

to be provided in conjunction with regular class placement." 34 C.F.R. § 300.115(a).

Importantly, "'[e]ducational placement' refers to the general educational program—such

as the classes, individualized attention and additional services a child will receive—rather

16

than the 'bricks and mortar' of the specific school."  T.Y. v. N.Y. City Dep't of Educ.,

584 F.3d 412, 419 (2d Cir. 2009).

"Placement decisions must be based on the child's IEP" and must be

individualized for each child.  Ellenberg, 478 F.3d at 1268.  By regulation, "each public

agency," "[i]n determining the educational placement of a child with a disability, . . .

must ensure that . . . (b) The child's placement—(1) Is determined at least annually; (2) Is

based on the child's IEP; and (3) Is as close as possible to the child's home."  34 C.F.R.

§ 300.116(b).  The public agency must further ensure that, "[u]nless the IEP of a child

with a disability requires some other arrangement, the child is educated in the school that

he or she would attend if nondisabled."  Id. § 300.116(c).

We have previously explained that

> [a] natural and logical reading of these two regulations is that a disabled child should be educated in the school he or she would attend if not disabled (i.e., the neighborhood school), unless the child's IEP requires placement elsewhere.  If the IEP requires placement elsewhere, then, in deciding where the appropriate placement is, geographical proximity to home is relevant, and the child should be placed as close to home as possible.  See Barnett v. Fairfax County Sch. Bd., 927 F.2d 146, 153 (4th Cir. 1991) (the regulations "require[ ] only that a school board take into account, as one factor, the geographical proximity of the placement in making these decisions") . . . ; Devries v. Fairfax County Sch. Bd., 882 F.2d 876 (4th Cir. 1989) (approving placement away from neighborhood school); Urban v. Jefferson County Sch. Dist. R–1, 870 F. Supp. 1558, 1568 (D. Colo. 1994) ("[T]he statutory preference for placement at a neighborhood school is only that—and it does not amount to a mandate.").  There is at most a preference for education in the neighborhood school.

Murray, 51 F.3d at 929 (addressing 34 C.F.R. § 300.552, subsequently redesignated 34 C.F.R. § 300.116[5]).

Plaintiffs allege that, in implementing its "hub" system, the District is circumventing the IDEA's requirement of an individualized determination of the most appropriate educational placement for each intellectually disabled student by automatically placing them in special classes for mild/moderate or severe intellectual disabilities based solely on a student's IQ.  That allegation states a plausible IDEA claim sufficient to survive Rule 12(b)(6) dismissal.  See K.D., 665 F.3d at 1123.

The District disputes the premise of Plaintiffs' IDEA claim.  It asserts, contrary to Plaintiffs' allegations in their complaint, that the District actually does make individualized educational placement determinations for each intellectually disabled student, as the IDEA requires.  To support its assertion, the District points, in particular, to the hearing officer's finding in E.J.'s administrative proceeding that, at least in E.J.'s case, the District did make an individualized educational placement determination and that, for E.J., that placement determination was appropriate.  But at the motion-to-dismiss stage of this litigation challenging the district-wide application of the "hub" system, we must accept as true Plaintiffs' contrary allegation—that the District, in implementing its "hub" system district-wide, does not make individualized placement determinations for each intellectually disabled

---

[5] See Assistance to States for the Education of Children With Disabilities,70 Fed. Reg. 35782-01, 35,787 (June 21, 2005).

18

student.  See Thomas, 225 F.3d at 1157.  Ultimately, to succeed on their claim, Plaintiffs will, of course, have to prove their allegations.

We, therefore, reverse the district court's Rule 12(b)(6) decision to dismiss Plaintiffs' IDEA claim challenging the District's implementation of the "hub" system on behalf of themselves and similarly situated students by alleging that the District fails to make individualized placement determinations for each intellectually disabled student and particularly fails to consider as a factor the geographic proximity of the placement.

### 2.  The individual Plaintiffs did not challenge the hearing officers' decisions in their individual administrative proceedings

Plaintiffs contend that, in addition to their IDEA claim asserted on behalf of themselves and similarly situated students challenging the district-wide application of the "hub" system, individual Plaintiffs E.J. and H.S. also asserted IDEA claims challenging the hearing officers' decisions in each of their individual administrative IDEA proceedings.  On appeal, Plaintiffs assert that the district court erred in dismissing this case without addressing their individual IDEA claims.  But Plaintiffs did not adequately challenge the hearing officers' decisions in their individual administrative proceedings.

In the usual IDEA case, a student asserts a claim on his own behalf seeking relief for himself under that statute.  The student must exhaust his administrative remedies and then can challenge the result of those proceedings in court.  But in this case, Plaintiffs clearly asserted instead a systemic challenge, on behalf of themselves

and similarly situated students, to the District's implementation of its hub policy district-wide.[6]  In light of that, if the individual Plaintiffs also wanted to challenge the hearing officers' decisions in their own administrative proceedings, they had to make that clear.  They did not do so.

Rule 8(a)(2), Federal Rules of Civil Procedure, generally requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." "'[D]etailed factual allegations' are not required."  Cline v. Clinical Perfusion Sys., Inc., 92 F.4th 926, 931 (10th Cir. 2024) (quoting Warnick v. Cooley, 895 F.3d 746, 751 (10th Cir. 2018)).  Nonetheless, "the complaint 'must give just enough factual detail to provide "fair notice of what the . . . claim is and the grounds upon which it rests."'"  Id. (quoting Warnick, 895 F.3d at 751 (quoting Twombly, 500 U.S at 555)). Plaintiffs' amended complaint did not give fair notice to the District (nor to the district court) that the individual Plaintiffs were each challenging the hearing officers' decisions in their individual administrative proceedings, in addition to their claims asserted on behalf of similarly situated students.

It is accurate that, in the section of their amended complaint entitled "Exhaustion of Administrative Remedies" (J.A. 46–49 ¶¶ 24–47), Plaintiffs described E.J.'s and H.S.'s administrative proceedings and then stated that both E.J. and H.S. "hereby appeal[] the administrative decision and assert[] additional claims through

---

[6] See Romer, 992 F.2d at 1042, 1044 (IDEA class action); see also N.M. Ass'n for Retarded Citizens, 678 F.2d at 849–51 (class action alleging state's "entire special education service system" violated the RA).

this civil action" (J.A. 49 ¶¶ 40, 47). But Plaintiffs' amended complaint did not otherwise address either hearing officer's decision, did not identify which portions of each administrative decision Plaintiffs specifically challenge, and did not request relief specific to those administrative decisions. Perhaps most significantly, Plaintiffs did not expressly challenge the hearing officer's factual finding in E.J.'s administrative proceeding that, at least as to her, the District made an individualized and appropriate educational placement decision. Further, the hearing officer in H.S.'s administrative case ruled that H.S. was not entitled to an administrative hearing because H.S.'s parents did not consent to his receiving special education services at a designated "hub" school. Plaintiffs did not mention, let alone specifically challenge, that ruling in their amended complaint. We conclude, then, that Plaintiffs failed to allege claims specifically challenging the hearing officers' decisions in E.J.'s and H.S.'s individual administrative proceedings. We leave for the district court to consider on remand what, if any, impact the unchallenged administrative decisions have on Plaintiffs' remaining representational claims.[7]

---

[7] In Association for Community Living in Colorado v. Romer, 992 F.2d 1040, 1042 (10th Cir. 1993), the Tenth Circuit addressed a class action brought under the IDEA. See also N.M. Ass'n for Retarded Citizens, 678 F.2d at 849–51 (addressing class action under the RA challenging state's "entire special education service system"). Other circuits, too, have recognized class actions brought under the IDEA. See, e.g., G.T. v. Bd. of Educ. of Cnty. of Kanawha, 117 F.4th 193, 197, 203–05 (4th Cir. 2024) (holding class was improperly certified in that case; discussing IDEA class actions from other circuits). In Romer, Plaintiffs—several organizations that sued on behalf of their members and four children with disabilities—sued the Colorado Department of Education ("CDE"), alleging the CDE's policies for extended school day and extended school year services denied disabled students a free and appropriate public education in violation of the IDEA. 992 F.2d at 1042–43. This court did not

21

say Plaintiffs could not assert a class action under the IDEA. Instead, this court held that, in light of the specific substantive claims at issue in that case, at least some of the individual plaintiffs had to exhaust their IDEA administrative remedies. Id. at 1042, 1044–45. In reaching that conclusion, Romer held that the specific claims at issue in that case did not fall into any of the recognized situations that would justify excusing exhaustion: where administrative remedies are inadequate or exhaustion would be futile, where plaintiffs assert "violations of the IDEA's due process provisions," or "where an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law." Id. at 1044 (internal quotation marks omitted). However, in dicta, Romer noted that other cases involving other types of IDEA class claims might not require exhaustion:

> Although we hold that the plaintiffs in this case failed to satisfy the IDEA's exhaustion requirement, we do not hold that every plaintiff in a class action must exhaust the IDEA's administrative remedies. There may be cases where the purposes of the exhaustion doctrine would not be furthered by having even one plaintiff exhaust the IDEA's administrative remedies. Even where exhaustion is necessary, the exhaustion of a few representative claims may be sufficient to secure statutory compliance and, if not, would at least serve the purposes of the exhaustion requirement and properly frame the issues for judicial review. . . .
>
> Under the circumstances of this case, we conclude that the purposes underlying exhaustion would be furthered by enforcing the requirement and that none of the exceptions apply. The IDEA's administrative process is adequately designed to address the issues presented in this complaint and lead to the statutory compliance the plaintiffs seek.

Id. at 1045.

In the case now before us, the individual Plaintiffs, E.J. and H.S., did exhaust their administrative remedies, but arguably in a flawed way. Both hearing officers held they lacked jurisdiction to consider the IDEA claims that E.J. and H.S. asserted on behalf of other, similarly situated students. In addition, E.J.'s hearing officer ruled, contrary to Plaintiffs' allegations in this litigation, that the District had provided E.J. with an individualized educational placement determination. H.S.'s hearing officer, on the other hand, held that H.S. was not even entitled to an IDEA administrative proceeding because his parents had declined to participate in the District's provision of special education services. Importantly, despite these arguable flaws in the individual Plaintiffs' administrative proceedings, the District has never asserted that this case should be dismissed because the individual Plaintiffs

22

**B. Discrimination claims under the ADA's Title II and the RA's Section 504**

Plaintiffs also assert claims alleging that the manner in which the District

implements its "hub" system violates both Title II of the ADA, see 42 U.S.C.

---

inadequately exhausted their administrative remedies. In fact, the District expressly "acknowledge[d] that Plaintiffs exhausted their administrative remedies under the IDEA." (J.A. 152.)

Nor has the District sought dismissal by arguing that these individual Plaintiffs (or the DLC) are not adequate parties to represent other, similarly situated students. Instead, the District sought dismissal of the IDEA claims solely because the District interpreted Plaintiffs' claims to be asserting a right to receive special education services in their neighborhood school, relief that is foreclosed by Tenth Circuit precedent. In seeking dismissal on that ground, the District noted that the individual Plaintiffs had not challenged the hearing officer's decision in each of their administrative proceedings. Plaintiffs responded by asserting that they, in fact, were challenging the results of their administrative proceedings. The District countered that Plaintiffs had not adequately alleged a challenge to those individual administrative decisions. Although the district court did not address that issue in dismissing this action, we have agreed with the District on this point. But the District never argued to the district court that the class allegations in this case should be dismissed because Plaintiffs did not challenge the individual administrative decisions. Nor does the District proffer that reason on appeal as an alternative ground to affirm dismissal. In light of that, we need not, and do not, decide in this appeal what impact, if any, Plaintiffs' failure to challenge the administrative decisions in their individual administrative proceedings will have on this class litigation as a whole.

On remand, the district court may also have to make decisions about what evidence it can consider going forward. Ordinarily, the district court will receive and consider only the administrative record from the IDEA hearing. See 20 U.S.C. § 1415(i)(2)(C). Before the district court, the parties disputed which side had to provide those administrative records and so no party has, as yet, provided the district court with the administrative records from their individual IDEA administrative proceedings. At a party's request, the district court can also hear additional evidence beyond those administrative records. See id. § 1415(i)(2)(C)(ii). But, because this case has not yet proceeded past Rule 12(b) dismissal, the district court did not address these potential evidence problems. It may have to do so on remand.

23

§§ 12131–12134, and the RA's Section 504, 29 U.S.C. § 794. These statutes proscribe similar conduct. Generally,

> Title II of the Americans with Disabilities Act (ADA) . . . and § 504 of the Rehabilitation Act . . . cover both adults and children with disabilities, in both public schools and other settings. Title II forbids any "public entity" from discriminating based on disability; Section 504 applies the same prohibition to any federally funded "program or activity." 42 U.S.C. §§ 12131–12132; 29 U.S.C. § 794(a).

Fry v. Napoleon Cmty. Schs., 580 U.S. 154, 159–60 (2017). We apply the same substantive legal standards to claims under these similar statutory provisions. See Urban, 89 F.3d at 727–28.

## 1. Administrative exhaustion

As an initial matter, the district court dismissed Plaintiffs' RA claim for failure to exhaust administrative remedies as the IDEA requires. The IDEA, 20 U.S.C. § 1415(*l*), requires plaintiffs to exhaust their administrative remedies under that statute before pursuing claims in court under other statutes, including the ADA and the RA, when those claims seek "relief that is also available under" the IDEA. See Fry, 580 U.S. at 157–58, 161; see also Luna Perez v. Sturgis Pub. Schs., 598 U.S. 142, 146–48 (2023) (addressing § 1415(*l*)).

Here, the individual Plaintiffs, E.J. and H.S., each asserted ADA discrimination claims on behalf of themselves and similarly situated students in their individual IDEA administrative proceedings. The administrative hearing officers dismissed those ADA claims for lack of subject matter jurisdiction. No one challenges the propriety of that administrative ruling in this case.

24

Although E.J. and H.S. asserted an ADA claim in their individual IDEA administrative proceedings, neither of them asserted an RA claim. In light of that, the district court in this litigation dismissed Plaintiffs' Section 504 RA claim without prejudice for failing to exhaust their IDEA administrative remedies.

Reviewing de novo, see Muskrat, 715 F.3d at 785, we conclude that was error. Under the circumstances presented here, had either E.J. or H.S. asserted a Section 504 RA claim on behalf of themselves and similarly situated students in their individual IDEA administrative proceedings, it is clear that the hearing officers would have also dismissed those RA claims for lack of jurisdiction, just as the hearing officers did with E.J.'s and H.S.'s ADA claims. It would, thus, have been futile for E.J. and H.S. to attempt to exhaust their administrative remedies by asserting a Section 504 RA claim in their IDEA administrative proceedings. See Chavez ex rel. M.C. v. N.M. Pub. Educ. Dep't, 621 F.3d 1275, 1280 (10th Cir. 2010) (recognizing exception to IDEA's exhaustion requirements when "exhaustion would be futile or fail to provide adequate relief"). We, therefore, consider next, along with their ADA claim, whether Plaintiffs have stated a plausible RA Section 504 claim. We conclude that Plaintiffs have adequately stated claims under both statutes.

### 2. Plaintiffs have stated plausible claims under the ADA and the RA sufficient to survive Rule 12(b)(6) dismissal

The district court dismissed Plaintiffs' ADA claim for the same reason it dismissed their IDEA claim, because the court interpreted those claims to be seeking only to receive special education services in their neighborhood schools, relief

25

foreclosed under Tenth Circuit precedent. We interpret Plaintiffs' claims to be broader. Reviewing de novo and accepting the truth of Plaintiffs' factual allegations, see Thomas, 225 F.3d at 1157, we conclude Plaintiffs have stated plausible ADA and RA Section 504 claims sufficient to survive Rule 12(b)(6) dismissal.

### a. ADA

The ADA specifically provides in relevant part: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also Urban, 89 F.3d at 727. Furthermore,

> [r]egulations promulgated under the ADA forbid public entities such as the District from denying a disabled person "the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities." 28 C.F.R. § 35.130(b)(2). The regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

Urban, 89 F.3d at 727.

Plaintiffs' ADA claim alleges, among other things, that the manner in which the District implements its "hub" system denies intellectually disabled students "an opportunity to participate in and benefit from educational services that is equal to that afforded other students," and denies them "the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs."

26

(J.A. 81 ¶ 217(a), (c).)  These allegations are adequate to state a plausible claim for relief under the ADA.  See N.M. Ass'n for Retarded Citizens, 678 F.2d at 849, 853 (addressing discrimination claim under Section 504 of the RA; holding "a federally-funded educational system may be found in violation of Section 504 where the entity's practices preclude the handicapped from obtaining system benefits realized by the non-handicapped").  The District does not argue to the contrary.

### b. RA Section 504

Similar to the ADA, the RA's Section 504 provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a).  Further, "a federally-funded education system may be found to violate Section 504 where the entity's practices preclude the handicapped from obtaining system benefits realized by the non-handicapped."  N.M. Ass'n for Retarded Citizens, 678 F.2d at 853.  In addition, the RA's implementing regulations provide, in part, that federal funding recipients, like the District, "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d).

Here, Plaintiffs allege, among other things, that the District is violating Section 504 by treating them unequally as compared to their non-disabled peers, including "denying [Plaintiffs] access to their neighborhood school" and failing "to

27

make services available in the most integrated setting appropriate." (J.A. 83 ¶¶ 227–28.) Because we have concluded that Plaintiffs adequately stated a claim under the ADA, and because the legal standards under the ADA and the RA are similar, see Urban, 89 F.3d at 727–28, we conclude Plaintiffs have also stated a plausible claim for relief under Section 504. See N.M. Ass'n for Retarded Citizens, 678 F.2d at 852–54.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's decision to dismiss Plaintiffs' IDEA, ADA, and RA claims based on allegations that the District, in implementing its "hub" system, fails to make individualized educational placement determinations for each intellectually disabled student. We further conclude, however, that the individual Plaintiffs, E.J. and H.S., did not allege IDEA claims challenging the hearing officers' rulings in their individual administrative proceedings. We REMAND this case for further proceedings consistent with this decision.